RECEIVED

2001 NOV -1  P 4: 3 1

~~RALPH P HACKETT, CLK~~
~~U.S. DISTRICT COURT~~

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

[FILED]

NOV  1 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| GREGORY CHAVERS; | ) |
| BELINDA JILL CHAVERS; | ) |
| RAY CHARLES MCGRADY; | ) |
| ARETTA WHITE, an alleged | ) |
| incompetent adult, by and through | ) |
| her Next Friend and | ) |
| Attorney-in-fact, James White; | ) |
| GERTRUDE GAMBLE; | ) |
| GWENDOLYN BROWN; | ) |
| RUFUS MOFFITT; | ) |
| TERRY CORDNER; | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) CASE NO.: _01 - M -1280 -N_ |
| | ) |
| BAYER CORPORATION; | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

### STATEMENT OF JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1332, for

diversity of citizenship and each Plaintiff, individually, claims an amount in controversy exceeding

$75,000.00.

1

## PARTIES

1.     Plaintiff, Gregory D. Waters, is over the age of 19 years, and is a resident of Troy, Pike County, Alabama. Gregory Waters suffered a subacute right middle cerebral artery infarct on November 2, 1999, within 12 hours of taking Alka Seltzer Plus Cold & Flu.

2.     Plaintiff, Belinda Jill Chavers, is over the age of 19 years, and is a resident of Evergreen, Conecuh County, Alabama. Jill Chavers suffered a subarachnoid hemorrhage with possible anterior communicating aneurysm on June 5, 1992, within 12 hours of taking Alka Seltzer Plus Cold.

3.     Plaintiff, Ray Charles McGrady, is over the age of 19 years, and is a resident of Troy, Pike County, Alabama. Ray Charles McGrady suffered a brain stem hemorrhage on January 24, 1999, within 12 hours of taking Alka Seltzer Plus Cold.

4.     Plaintiff, Aretta White, is over the age of 19 years, and is a resident of Bessemer, Jefferson County, Alabama. Aretta White is an alleged incompetent adult, who brings this action by and through her Next Friend and Attorney-in-fact by a Durable Power of Attorney. Aretta White suffered a left parieto-temporal intracranial bleed on August 17, 2000, within 12 hours if taking Alka Seltzer Plus Cold.

5.     Plaintiff, Gertrude Gamble, is over the age of 19 years, and is a resident of Mobile, Mobile County, Alabama. Gertrude Gamble suffered a right parietal intraparenchymal hemorrhage on July 5, 1999, within 12 hours of taking Alka Seltzer Plus Cold.

6.     Plaintiff, Gwendolyn Brown, is over the age of 19 years, and is a resident of

2

Northport, Tuscaloosa County, Alabama. Gwendolyn Brown suffered right thalamic and right basal ganglia hemorrhages on February 22, 1998, within 12 hours of taking Alka Seltzer Plus Cold and Alka Seltzer Plus Nighttime Cold.

7.     Plaintiff, Rufus Moffitt, is over the age of 19 years, and is a resident of Cottondale, Tuscaloosa County, Alabama. Rufus Moffitt suffered a left lacunar infarct on June 8, 2000, within 12 hours of taking Alka Seltzer Plus Cold.

8.     Plaintiff, Terry Cordner, is over the age of 19 years, and is a resident of Sylacauga, Coosa County, Alabama. Terry Cordner suffered a left frontal infarct on January 18, 2000, within 12 hours of taking Alka Seltzer Plus Cold.

9.     Defendant, Bayer Corporation, is a corporation of the state of Indiana, with its principal place of business in Pittsburgh, Pennsylvania. At all relevant times herein, Bayer Corporation was in the business of promoting, manufacturing and distributing products containing Phenylpropanolamine ("PPA"). Defendant does business in Alabama and at all relevant times hereto, marketed, promoted, warranted and sold it products containing PPA in Alabama.

3

## ALLEGATIONS FOR JOINDER

10.    All the Plaintiffs took a formulation of Alka Seltzer Plus Cold medication containing phenylpropanolamine manufactured and sold by the Defendant, Bayer Corporation, in the recommended dosages and for the manufacturer's recommended indications. All the Plaintiffs suffered injuries as a direct and proximate consequence of the use of Defendant's Alka Seltzer Plus Cold medications. Alka Seltzer Plus Cold medications contain phenylpropanolamine (hereinafter referred to as "PPA"), which is associated with serious injuries such as hemorrhagic strokes, ischemic strokes and ruptured aneurysms. Plaintiffs allege that the mechanism of injury is the same in all cases, and starts with the ingestion of Alka Seltzer Plus Cold medications containing PPA. Plaintiffs allege that Alka Seltzer Plus Cold medications, when used as recommended by the manufacturer, are dangerous and unsafe, and therefore defective drugs. Plaintiffs allege that Defendants failed to adequately warn them of the dangers of the foreseeable and normal use of this medicine.

11.    There are common questions of law and fact which exist in each of the claims of the Plaintiffs. The common facts are set out in this Complaint.

4

## FACTS

12.    At all relevant times hereto, Defendant, Bayer Corporation, was a designer, manufacturer, marketer, advertiser, distributor, and seller of non-prescription, over-the counter pharmaceutical products, including cold, flu and allergy remedy products, which contained PPA as an active ingredient. The following products containing PPA were purposefully and regularly distributed, marketed, advertised, and sold throughout the United States by Bayer Corporation (hereafter the products are referred to as "PPA Products"): Alka-Seltzer Plus Children's Cold Medicine Effervescent; Alka-Seltzer Plus Cold Medicine (Cherry or Orange Flavor); Alka-Seltzer Plus Cold Medicine Original; Alka-Seltzer Plus Cold & Cough Medicine Effervescent; Alka-Seltzer Plus Cold & Flu Medicine Effervescent; Alka-Seltzer Plus Cold & Sinus Effervescent; Alka-Seltzer Plus Night-Time Cold Medicine.

13.    At all times material to this action, Defendant engaged in the designing, testing, manufacturing, marketing, advertising, distributing and selling of non-prescription, pharmaceutical products, including cold, flu, and sinus products containing PPA. Defendant designed, tested, manufactured, marketed, advertised, distributed and/or sold the Alka Seltzer Plus products listed above, containing PPA.

14.    PPA is a sympathomimetic amine similar in structure and function to amphetamine and ephedrine. It has a direct vasoconstricting effect on the human body. A sympathomimetic drug such as PPA increases arterial blood pressure and stimulates the release of norepinepherine.

5

15.    For decades, Defendant has known or should have known that human consumption of sympathomimetic drug can cause serious, life threatening adverse health effects including damage to the cardiovascular and neurological systems.  Known effects associated with the use of sympathomimetic drugs like PPA include hypertension, seizure, heart attack, headache, hypertensive encephalopathy, agitation, psychosis, hemorrhagic stroke, ischemic stroke, neurological problems and symptoms, cardiac problems, sudden cardiac and neurological changes, and death. Defendant, Bayer Corporation, as a principal manufacturer of pharmaceutical products knew of the dangers associated with the consumption of sympathomimetic drug such as PPA and as such was fully aware of the dangers posed by the consumption of PPA.  Despite this knowledge, for years, Defendant used PPA in many non-prescription, over-the-counter, cold, flu and sinus medications.  Defendant marketed and advertised its products to the general public and to the medical community as being safe and effective for their stated purposes.

### The FDA Regulatory History of PPA

16.    PPA was first synthesized in 1910 and was used in the early 1930s as an alternative to ephedrine in maintaining blood pressure after surgery.  The ability of PPA to raise arterial blood pressure is primarily due to the action of PPA on constricting blood vessels via direct and, possibly, indirect activation of alpha-1-adrenoceptors.

17.    PPA in the United States has been used in two primary over-the-counter (OTC) markets: as a decongestant in cough and cold products and as an appetite suppressant in diet pills.

6

PPA was first used as a decongestant in 1936 and produced vasoconstriction of the mucosal blood vessels to alleviate congestion. PPA was first used as an appetite suppressant in 1972.

18.    In 1938, the Food and Drug Administration ("FDA") was created. Under the original Act (Federal Food, Drug and Cosmetic Act of 1938, now codified at 21 U.S.C. §§ 301 et seq.), new drugs required the approval of the FDA. Existing drugs were "grandfathered" under the Act and thus exempted from the testing requirements of new drugs. No proof of safety was required for grandfathered drugs. Having been on the market as a decongestant since 1936, PPA was exempt from the new drug approval process.

19.    In 1962, the Drug Amendments to the Act, Pub. L. No. 87-781, 76 Stat. 780, required proof of effectiveness for all new drugs, including those approved between 1938 and 1962. The pre-1938 drugs previously "grandfathered" under the Act, such as PPA, continued their exempt status.

20.    The FDA regulates all OTC drugs, which are classified by the FDA as Category I (safe and effective); Category II (not safe and effective); or Category III (insufficient data to assess safety).

21.    In 1972, the FDA began to review OTC drugs for classification. As an OTC product marketed before 1972, PPA was allowed to continue on the market until a "final monograph" relating to the drug's category became effective. The FDA never finalized a monograph for PPA because of concerns about reports of hemorrhagic stroke associated with using this drug. PPA was never classified by the FDA as a Category I (safe and effective) OTC drug.

### PPA's Association with Risk of Hemorrhagic and Ischemic Events

22.    For more than twenty years, the OTC pharmaceutical industry has been aware of reports of hemorrhagic stroke, ruptured aneurysms, heart arrhythmia, cerebral vascular accidents, infarctions and heart attacks, associated with the use of PPA. Furthermore, published reports of PPA use associated with hypertension date back over thirty years.

23.    Since 1979, there have been over thirty published case reports in the peer reviewed medical literature of stroke and PPA ingestion, often after the first use of the product. A number of these authors, medical authorities and medical "Watch-Dog" agencies such as Public Citizen called for the removal of PPA from the OTC market. Case reports and medical literature reviews of hemorrhagic stroke and cerebral vascular accidents after PPA exposure appearing in the scientific and medical literature include but are not limited to:

> King (1979)
>> Elliot and White (1981)
>> Bernstein and Diskant (1982)
>> Johnson, Etter, and Reeves (1983)
>> Mueller (1983)
>> Pentel (1984)
>> Fallis and Fisher (1985)
> Kikta (1985)
>> McDowell, LeBlanc (1985)
>> Stoessl, Young and Feasby (1985)
>> Edwards, Russo, Harwood-Nuss (1987)
>> Glick, et al (1987)
>> Kase, et al (1987)
>> Forman, et al (1989)
>> Montalban, et al (1989)
>> Chung (1998)

8

> ➤   Hamilton, et al (2000)
> ➤   Lake, Gallant, Masson, Miller (2000)

24.    Since at least 1980, it has been recognized by the medical and scientific community that PPA can cause severe hypertension, and that at the same time, it has a direct effect on vasoconstriction of small blood vessels.

25.    In 1981, an editorial in the American Journal of Medicine and the consumer group publication, Public Citizen, expressly recommended against PPA use in the OTC market because of safety risks, especially those related to hemorrhagic stroke.

26.    In 1983, the FDA determined that PPA raises blood pressure and later met with industry officials to discuss the need for more data to evaluate the safety concerns surrounding PPA and life threatening adverse reactions including hypertension and stroke.

27.    In 1984, the FDA banned the sale of products containing a combination of PPA and caffeine due to safety and health concerns.

28.    In 1985, the FDA issued a tentative final monograph for classifying OTC nasal decongestants. PPA, however, was omitted from the monograph due to safety concerns.

29.    In 1990, a review article of 142 PPA case reports concluded that the most serious adverse reactions (stroke and seizure) were caused by PPA products.

30. Also, in 1990, a subcommittee of the U.S. House of Representatives Small Business Committee held hearings on diet drugs containing PPA. At the hearings, several scientific witnesses and one national society of physicians called for the removal of PPA from the OTC market because of safety and health concerns. After the hearings, the subcommittee's chairman, U.S. Representative Ron Wyden, wrote to the FDA expressing his concern about PPA and noting that an epidemiological study had demonstrated that PPA preparations lead all other OTC products in the number of serious and fatal adverse effects in people under 29 years of age, as well as the number of contacts with Poison Control Centers each year.

31. Between 1969 and 1991, 29 cases of cerebral vascular incidents associated with PPA use were reported to the FDA through its spontaneous adverse event reporting system. Of these 29 reports, 22 were hemorrhagic strokes associated with PPA use. Of these strokes, 55% occurred after just one dose of the PPA product.

32. In 1991, H. M. Jolson produced an internal report for the FDA that examined the reports of cerebral vascular stroke in the FDA spontaneous reporting system for PPA versus all other drugs for women for the period of 1969-1991. Her analysis indicated that cerebral vascular stroke was the most common event for PPA-containing products; that such events were also evident in cough-cold preparations; and that such events were often associated with first use of PPA

10

products. Despite this information, consumers were not being timely or adequately warned by the pharmaceutical industry about the then-known association between PPA and stroke.

33.    In 1991, the FDA held a public meeting to address the issues regarding safety and effectiveness of PPA before publishing a final monograph for the drug. Reports of hemorrhagic strokes associated with PPA use were discussed at the meeting.

34.    Between 1991 and 2000, the FDA received an additional 22 reports of hemorrhagic strokes associated with PPA use. Four of these consumers died of their stroke injuries.

35.    Although most of the attention has been directed to the association between PPA and hemorrhagic stroke, there have been numerous case reports of heart attacks, lacunar infarcts, infarcts of cerebral arteries, and ischemic events associated with the use of PPA. The same mechanism, PPA causing severe hypertension and direct vasoconstriction of the blood vessels, which causes hemorrhagic strokes and ruptured aneurysms, causes these ischemic events and heart attacks.

36.    Thus, by the time each of the Plaintiffs ingested the Alka Seltzer Plus Cold medications, numerous reports of PPA-related serious health problems including hemorrhagic stroke, ischemic stroke, hypertension and neurological and

11

cardiac symptoms and problems, had been made to the FDA and knowledge of that information and the reasons why PPA should be removed from the marketplace were well known, or should have been, to the Defendant. These numerous adverse reports and the ongoing Yale Study, infra, were known, or should have been known, to the Defendant, however, Bayer Corporation persisted in the distribution, marketing and sale of the Alka Seltzer Plus products.

### The Yale Hemorrhagic Stroke Study

37.    In March of 1993, the FDA issued a letter to the Nonprescription Drug Manufacturers Association outlining its concerns regarding the safety of PPA and informed the industry that it intended to classify PPA as a Category III drug (insufficient data to assess safety). To avoid this classification, manufacturers of PPA proposed a study, which later became known as the Yale Hemorrhagic Stroke Study, to investigate the link between PPA and strokes. While the study was ongoing, the manufacturers were able to continue selling PPA products.

38.    Subsequently, the FDA began working with PPA manufacturers and investigators at Yale University School of Medicine to design the protocol for the study, a case controlled epidemiological study to examine and quantify the risk of hemorrhagic stroke and PPA use.

39.    On December 13, 2000, in a New York Times article the FDA director of OTC drugs stated that if the Yale study had not been undertaken, "The agency probably would have decided to take PPA off the market [in 1992]."

40.    In September 1994, the Yale Study, which was funded by the pharmaceutical industry, began. The study was completed in June 1999.

41.    The Yale Study confirmed by epidemiological methodologies that the use of PPA substantially increases the risk of hemorrhagic stroke. The "first use" of any PPA product involving "cough/cold" remedies was associated with an increased risk of hemorrhagic stroke.

42.    Defendant was provided with the final results of the Yale Study, at the latest, during the May 2000 meetings with the FDA, but was also aware of the existence of the study for years prior to that date and the concerns that existed in the medical/scientific community that PPA was associated with causing hemorrhagic and ischemic strokes.

43.    On November 6, 2000, the summary results of the Yale Study appeared in the popular press, including the front page of the New York Times newspaper. On December 21, 2000, the study and its results were officially published as an original, lead article in the peer-reviewed New England Journal of Medicine. Its authors concluded that the Yale Study, **"provides strong epidemiological evidence of the association between the use of**

13

**phenylpropanolamine and the risk of hemorrhagic stroke."** Walter N. Kernan et al., Phenylpropanolamine and the Risk of Hemorrhagic Stroke, 343 New Eng. J. Med. 1826, 1831 (2000).

44.    Read in conjunction with the large body of prior published medical case reports, FDA adverse event reports and related clinical observations, the Yale Study establishes that PPA causes hemorrhagic strokes in human beings.

### The FDA Recommends PPA Be Withdrawn from the Market

45.    On October 19, 2000, members of the Non-Prescription Drugs Advisory Committee for the FDA's Center for Drug Evaluation and Research met to vote on the safety of PPA in light of the Yale Study findings. The 15-member panel voted overwhelmingly that PPA was unsafe, and recommended to the FDA that PPA be removed from the marketplace.

46.    On November 6, 2000, the FDA, in reliance upon its advisory committee and the findings of the Yale Study, officially recommended that all pharmaceutical companies voluntarily remove PPA from their products. By correspondence of the same date, the FDA urged all manufacturers and sellers of OTC products containing PPA to cease immediately the distribution and sale of said products.

47.    On the same day, the FDA's Nonprescription Drugs Advisory Committee issued the following advisory:

14

Food and Drug Administration
Public Health Advisory
Subject: Safety of Phenylpropanolamine
November 6, 2000

*The Food and Drug Administration (FDA) is issuing a public health advisory concerning phenylpropanolamine hydrochloride. This drug is widely used as a nasal decongestant (in over-the-counter and prescription drug products) and for weight control (in over-the-counter drug products). FDA is taking steps to remove phenylpropanolamine from all drug products and has requested that all drug companies discontinue marketing products containing phenylpropanolamine.*

*Phenylpropanolamine has been marketed for many years. A recent study reported that taking phenylpropanolamine increases the risk of hemorrhagic stroke (bleeding into the brain or into tissue surrounding the brain) in women. Men may also be at risk. Although the risk of hemorrhagic stroke is very low, FDA recommends that consumers not use any products that contain phenylpropanolamine.*

*FDA's Nonprescription Drugs Advisory Committee (NDAC) recently discussed this study and other information on phenylpropanolamine. NDAC determined that there is an association between phenylpropanolamine and hemorrhagic stroke and recommended that phenylpropanolamine not be considered safe for over-the-counter use.*

*Although this risk of hemorrhagic stroke is very low, FDA has significant concerns because of the seriousness of a stroke and the inability to predict who is at risk. FDA does not consider the conditions for which phenylpropanolamine is used (over-the-counter or by prescription) as justifying the risk of this serious event. Other products are available for use.*

*In the meantime, consumers can identify over-the-counter cough-cold, nasal decongestant, and weight control products containing this ingredient by looking for "phenylpropanolamine" in the list of active ingredients on the label. Consumers can check with their health care provider or pharmacist to see whether their prescription cough-cold or nasal decongestant product contains phenylpropanolamine. We advise consumers to discuss alternative*

15

*over-the-counter and prescription products with their health care providers
or pharmacists.*

48.    The FDA has concluded after internal and independent analysis that the Yale Study

was "carefully designed," "conducted with great attention to detail," and constitutes a "careful

analysis." Moreover, the FDA has confirmed the major findings of the Yale Study by conducting

its own analysis of the epidemiological data. The FDA has concluded that the Yale Study

"strongly supports" the working hypothesis: PPA use increases the risk of hemorrhagic stroke.

Indeed, the FDA has concluded that the Yale Study results largely fulfill the criteria needed to

establish "causality."

### Defendant's Knowledge About PPA and the Risk of Hemorrhagic Stroke

49.    Defendant knew or should have known, about the decades-long history of case

reports in the published medical literature establishing a meaningful clinical/medical association

between PPA and risk of stroke, the adverse event reports filed with the FDA, and numerous

adverse reports from the Company's own internal safety surveillance database, all of which relate

to strokes arising from PPA exposure.

50.    Defendant used PPA in its products due to its efficacy as a vaso-constrictor. PPA works

to constrict blood vessels in congested nasal mucosa thereby relieving swelling and congestion and

other symptoms associated with cold, flu and sinus ailments. However, PPA is not selective of

nasal mucosa, but also constricts blood vessels in other parts of the body including the brain and

heart. The process of constricting blood vessels raises blood pressure and causes severe

16

hypertension. When blood pressure is raised to a critical level it increases the likelihood of severe life threatening and often fatal effects including but not limited to heart attack and stroke.

51.    Defendant was aware or should have been aware of the evidence relating PPA to potentially life threatening and fatal reactions.

52.    At all times material, Defendant was a member of the Consumer Healthcare Products Association ("CHPA") (f/k/a Non-Prescription Drug Manufacturers Association ("NDMA")). A function of the CHPA is to provide information to its members concerning issues of importance to the industry. As a member of CHPA, Defendant participated in numerous communications and discussions directly related to the safety and known adverse health effects of products containing PPA.

53.    CHPA set up a PPA Task Force whose objective was, among other things, to study the adverse effects of PPA and to address concerns of the scientific and medical communities with respect to PPA. In working to fulfill its mission, CHPA's Task Force collected information from the medical and scientific communities. Defendant, by and through CHPA and the PPA Task Force, reviewed the collected medical and scientific literature regarding products containing PPA. As such, Defendant was fully aware of the numerous articles, treatises, reports and other evidence relating to the association between PPA and adverse health effects including stroke, heart attack, arrhythmias and death.

17

54.    Despite Defendant's knowledge concerning the adverse affects of PPA, Defendant continued to manufacture, market, advertise, distribute, and sell products containing PPA. Defendant promoted PPA products as safe and effective with little or no side effects. In addition, Defendant made no efforts to warn the general public of the dangers associated with PPA nor did Defendant take any steps to alert the medical community and inform them of the significant risks associated with PPA.

55.    To the contrary, Defendant actively engaged in downplaying and minimizing any potential adverse side effects associated with the consumption of PPA. Defendant represented to the general public and to the medical community that PPA products were safe for human consumption. Defendant concealed from the general public that PPA in OTC products could cause stroke, heart attack, heart arrhythmias and death.

56.    Defendant knew or should have known that the general public considered over-the-counter medications, like the Alka Seltzer Plus products to be innocuous because of their ready availability without a prescription. The perception of the public relating to the safety of such over-the-counter drugs only increased the likelihood of serious adverse health consequences associated with the consumption of PPA.

57.    Defendant failed to sufficiently test PPA products prior to marketing and selling them to the general public. The tests and studies performed by Defendant on PPA products lacked validity

in that Defendant failed to test PPA products and their effects on the cardiovascular and central nervous systems over a reasonable period of time before and during the distribution and sale of the PPA products to the public. Nevertheless, Defendant represented PPA products as pharmaceutically tested and safe for consumption, placing the general population at risk of severe adverse health effects including hemorrhagic and ischemic stroke, heart attack, heart arrhythmias and death.

58.     Based upon Defendant's marketing, advertising, promotion and representation of products containing PPA as being safe and effective, Plaintiffs, purchased and ingested Defendant's products containing PPA. However, Defendant's products were not safe as marketed, advertised, promoted and represented by Defendant in that Defendant knew or should have known that PPA products could cause hemorrhagic and ischemic stroke, heart attack, heart arrhythmias and death. Defendant failed to warn Plaintiffs of the dangers associated with ingesting medicines that contained PPA.

59.     Throughout the time period that Defendant manufactured, offered, distributed, marketed and sold products containing PPA, it has been aware of the health risk and adverse effects of PPA. Defendant has concealed this information from Plaintiffs and from the general public. Plaintiffs did not discover and could not have discovered this information absent Defendant's disclosure. Because of the intentional conduct of the Defendant and the pharmaceutical industry to conceal important information about the dangerous risks of PPA medications, the information was not

19

known to Plaintiffs, and in fact is still not fully known by the Plaintiffs. Plaintiffs have just now learned of some of these risks.

## COUNT ONE

### Alabama Extended Manufacturer's Liability Doctrine

60.    Plaintiffs adopt and incorporate by reference all the above allegations.

61.    At all times material hereto, the Defendant has engaged in the business of selling, distributing, supplying, manufacturing, marketing and promoting Alka-Seltzer Plus Cold products, which contained PPA, an ingredient that is defective and unreasonably dangerous.

62.    At all times material hereto, Alka-Seltzer Plus Cold products were sold, distributed, supplied, manufactured and promoted by the Defendant and were expected to reach, and did reach, consumers, including the Plaintiffs without substantial change in the condition in which it left the possession of Defendant.

63.    At all times material hereto, the Alka-Seltzer Plus Cold products were defective and unreasonably dangerous because:

    a.    When placed in the stream of commerce, the medications contained unreasonably dangerous defects and were not reasonably safe as intended to be used, subjecting Plaintiffs to risks which exceeded the benefits of the drug;

20

b.      When placed in the stream of commerce, the medications were defective in design

and formulation, making use of the drug more dangerous than an ordinary consumer

would expect and more dangerous than other risks associated with nasal congestion;

c.      The medications were insufficiently and inadequately tested;

d.      The medications were not accompanied by adequate instructions and warnings to

fully apprise the user of the full nature and extent of the risks and dangerous side

effects associated with their use;

e.      The medications increased the risk of hypertension and stroke.

f.      Failed to adequately warn Plaintiffs that the Alka Seltzer Plus Cold products should

not be used in conjunction with other medicines containing PPA or other stimulants

such as caffeine.

64.      As a direct producing and proximate result of the actions and conduct of these

Defendant as set forth above, Plaintiffs, each of them individually, have sustained injuries and are

entitled to the following damages:

a.      Reasonable and necessary health care expenses incurred in the past;

b.      Reasonable and necessary health care expenses which, in all reasonable probability,
         will be incurred in the future;

c.      Physical pain and suffering in the past;

d.      Physical pain and suffering which, in all reasonable probability, will be endured in
         the future;

21

e.      Mental anguish suffered in the past;

f.      Mental anguish which, in all reasonable probability, will be suffered in the future;

g.      Physical disability/impairment, past and future;

h.      Lost wages in the past and future loss of wage earning capacity; and

i.      All other incidental and consequential damages, fees and expenses.

For each of the above, Plaintiffs, individually, seek compensatory damages in an amount in excess of the minimum jurisdictional limits of the Court, for which amount Plaintiffs now sue.

WHEREFORE, THE ABOVE PREMISES CONSIDERED, Plaintiffs demand judgment of the Defendant, Bayer Corporation, for compensatory damages in an amount determined by the jury to be necessary and just.

## COUNT TWO

### Failure to Warn

65.     Plaintiffs adopt and incorporate by reference all the above allegations.

66.     Alka-Seltzer Plus Cold products were defective and unreasonably dangerous when these products left the possession of the Defendant in that they contained warnings insufficient to alert the Plaintiffs to the dangerous risks and reactions associated with the drug, including, but not limited to stroke.

22

67.    Plaintiffs used the medication for its intended purpose, i.e., as a nasal decongestant and cold remedy.

68.    Plaintiffs could not have discovered any defect in the drug products through the exercise of reasonable care.

69.    Defendant, as a manufacturer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant had knowledge of the dangerous risks and side effects of the medications.

70.    Plaintiffs did not have the same knowledge as Defendant and no adequate warning was communicated to any of them.

71.    Defendant had a continuing duty to warn consumers, including the Plaintiffs, of its products, and the risks and dangers associated with the medicines, and by negligently and/or wantonly failing to adequately warn of the danger of using the PPA products in question, Defendant breached its duty.

72.    As a direct producing and proximate result of the actions and conduct of these Defendant as set forth above, Plaintiffs, each of them individually, have sustained injuries and are entitled to the following damages:

a.    Reasonable and necessary health care expenses incurred in the past;

b.    Reasonable and necessary health care expenses which, in all reasonable probability, will be incurred in the future;

23

c.      Physical pain and suffering in the past;

d.      Physical pain and suffering which, in all reasonable probability, will be endured in the future;

e.      Mental anguish suffered in the past;

f.      Mental anguish which, in all reasonable probability, will be suffered in the future;

g.      Physical disability/impairment, past and future;

h.      Lost wages in the past and future loss of wage earning capacity; and

i.      All other incidental and consequential damages, fees and expenses.

For each of the above, Plaintiffs, individually, seek compensatory damages in an amount in excess of the minimum jurisdictional limits of the Court, for which amount Plaintiffs now sue.

WHEREFORE, THE ABOVE PREMISES CONSIDERED, Plaintiffs demand judgment of the Defendant, Bayer Corporation, for compensatory and punitive damages in an amount determined by the jury to be necessary and just.

## COUNT THREE

### Breach of Warranty of Merchantability

73.     Plaintiffs adopt and incorporate by reference all the above allegations.

74.     When Defendant placed the Alka-Seltzer Plus Cold products into the stream of commerce, it knew that the medicine would be used as a nasal decongestant and cold remedy, and

expressly and impliedly warranted to each of the Plaintiffs that use of these medicines was a safe and acceptable means of relieving nasal decongestion and cold symptoms.

75.    Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of the Defendant and upon the express and/or implied warranty that the Alka-Seltzer Plus Cold products were of merchantable quality and fit for use to relieve nasal decongestion and cold symptoms.

76.    The Alka-Seltzer Plus Cold products were not of merchantable quality and were not safe or fit for their intended use because they were and continue to be unreasonably dangerous and unfit for the ordinary purposes for which they are used, in that they caused injuries and damages. The medications breached the warranties because they were unduly dangerous in expected use and did cause undue injuries to the Plaintiffs.

77.    As a direct producing and proximate result of the actions and conduct of these Defendant as set forth above, Plaintiffs, each of them individually, have sustained injuries and are entitled to the following damages:

    a.    Reasonable and necessary health care expenses incurred in the past;

    b.    Reasonable and necessary health care expenses which, in all reasonable probability, will be incurred in the future;

    c.    Physical pain and suffering in the past;

    d.    Physical pain and suffering which, in all reasonable probability, will be endured in the future;

    e.    Mental anguish suffered in the past;

25

f.      Mental anguish which, in all reasonable probability, will be suffered in the future;

g.      Physical disability/impairment, past and future;

h.      Lost wages in the past and future loss of wage earning capacity; and

i.      All other incidental and consequential damages, fees and expenses.

For each of the above, Plaintiffs, individually, seek compensatory damages in an amount in excess of the minimum jurisdictional limits of the Court, for which amount Plaintiffs now sue.

WHEREFORE, THE ABOVE PREMISES CONSIDERED, Plaintiffs demand judgment of the Defendant, Bayer Corporation, for compensatory damages in an amount determined by the jury to be necessary and just.

## COUNT FOUR

### Negligence

78.     Plaintiffs adopt and incorporate by reference all the allegations above.

79.     Defendant negligently manufactured, designed, tested, labeled, packaged, distributed, promoted, marketed, advertised, and sold, in the state of Alabama, Alka-Seltzer Plus Cold medications containing the drug PPA.

80.     At all times material hereto, Defendant had a duty to each of the Plaintiffs to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, packaging, distribution, promotion and sale of its medications containing PPA.

26

81.    Defendant breached its duty and was negligent in its actions, misrepresentations, and omissions toward the Plaintiffs in the following ways:

a.    Failed to include adequate warnings with the medications that would alert Plaintiffs and other consumers to the potential risks and serious side effects of the PPA medications;

b.    Failed to adequately and properly test the PPA medications before placing them on the market;

c.    Failed to conduct sufficient testing on the PPA medications which, if properly performed, would have shown that PPA had serious side effects, including, but not limited to, risk of stroke;

d.    Failed to adequately warn Plaintiffs that use of the PPA medications carried a risk of disability and death due to stroke and other serious side effects;

e.    Failed to provide adequate post-marketing warnings or instructions after the Defendant knew or should have known of the significant risks of stroke from the use of PPA medications;

f.    Failed to adequately warn Plaintiffs that Alka-Seltzer Plus Cold products should not be used in conjunction with other medicines containing PPA or other stimulants such as caffeine.

27

82.    Defendant knew or should have known that PPA medications caused unreasonably dangerous risks and serious side effects of which Plaintiffs would not be aware.  Defendant nevertheless advertised, marketed, sold and distributed the drug knowing that there were safer methods and products for nasal congestion and cold symptom relief.

83.    As a direct producing and proximate result of the actions and conduct of these Defendant as set forth above, Plaintiffs, each of them individually, have sustained injuries and are entitled to the following damages:

a.    Reasonable and necessary health care expenses incurred in the past;

b.    Reasonable and necessary health care expenses which, in all reasonable probability, will be incurred in the future;

c.    Physical pain and suffering in the past;

d.    Physical pain and suffering which, in all reasonable probability, will be endured in the future;

e.    Mental anguish suffered in the past;

f.    Mental anguish which, in all reasonable probability, will be suffered in the future;

g.    Physical disability/impairment, past and future;

h.    Lost wages in the past and future loss of wage earning capacity; and

i.    All other incidental and consequential damages, fees and expenses.

For each of the above, Plaintiffs, individually, seek compensatory damages in an amount in excess of the minimum jurisdictional limits of the Court, for which amount Plaintiffs now sue.

28

WHEREFORE, THE ABOVE PREMISES CONSIDERED, Plaintiffs demand judgment of the Defendant, Bayer Corporation, for compensatory damages in an amount determined by the jury to be necessary and just.

## COUNT FIVE

### Wantonness

84.     Plaintiffs adopt and incorporate by reference all the allegations above.

85.     Defendant wantonly and recklessly manufactured, designed, tested, labeled, packaged, distributed, promoted, marketed, advertised, and sold, in the state of Alabama, Alka-Seltzer Plus Cold medications containing the drug PPA.

86.     At all times material hereto, Defendant had a duty to each of the Plaintiffs to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, packaging, distribution, promotion and sale of its medications containing PPA.

87.     Defendant breached its duty and was wanton and reckless in its actions, misrepresentations, and omissions toward the Plaintiffs in the following ways:

    a.     Failed to include adequate warnings with the medications that would alert Plaintiffs and other consumers to the potential risks and serious side effects of the PPA medications;

b.     Failed to adequately and properly test the PPA medications before placing them on the market;

c.     Failed to conduct sufficient testing on the PPA medications which, if properly performed, would have shown that PPA had serious side effects, including, but not limited to, risk of stroke;

d.     Failed to adequately warn Plaintiffs that use of the PPA medications carried a risk of disability and death due to stroke and other serious side effects;

e.     Failed to provide adequate post-marketing warnings or instructions after the Defendant knew or should have known of the significant risks of stroke from the use of PPA medications;

f.     Failed to adequately warn Plaintiffs that Alka-Seltzer Plus Cold products should not be used in conjunction with other medicines containing PPA or other stimulants such as caffeine.

88.     Defendant knew or should have known that PPA medications caused unreasonably dangerous risks and serious side effects of which Plaintiffs would not be aware. Defendant nevertheless advertised, marketed, sold and distributed the drug knowing that there were safer methods and products for nasal congestion and cold symptom relief.

89.     As a direct producing and proximate result of the actions and conduct of these Defendant as set forth above, Plaintiffs, each of them individually, have sustained injuries and are

30

entitled to the following damages:

    a.    Reasonable and necessary health care expenses incurred in the past;

    b.    Reasonable and necessary health care expenses which, in all reasonable probability, will be incurred in the future;

    c.    Physical pain and suffering in the past;

    d.    Physical pain and suffering which, in all reasonable probability, will be endured in the future;

    e.    Mental anguish suffered in the past;

    f.    Mental anguish which, in all reasonable probability, will be suffered in the future;

    g.    Physical disability/impairment, past and future;

    h.    Lost wages in the past and future loss of wage earning capacity; and

    i.    All other incidental and consequential damages, fees and expenses.

For each of the above, Plaintiffs, individually, seek compensatory damages in an amount in excess of the minimum jurisdictional limits of the Court, for which amount Plaintiffs now sue.

WHEREFORE, THE ABOVE PREMISES CONSIDERED, Plaintiffs demand judgment of the Defendant, Bayer Corporation, for compensatory and punitive damages in an amount determined by the jury to be necessary and just.

## COUNT SIX

### Fraud, Misrepresentation and Suppression

31

90.   Plaintiffs adopt and incorporate by reference all the allegations above.

91.   Defendant fraudulently, intentionally and/or negligently misrepresented to the Plaintiffs, the FDA, and general public, the safety and effectiveness of PPA products and/or fraudulently, intentionally and/or negligently concealed material including adverse information regarding the safety and effectiveness of PPA.

92.   Defendant made misrepresentations and actively concealed adverse information at a time when the Defendant knew, or should have known, that PPA had defects, dangers, and characteristics that were other than what the Defendant had represented to the FDA, and the consuming public, including the Plaintiffs. Specifically, the Defendant misrepresented to and/or actively concealed from the Plaintiffs, the FDA, and the consuming public that:

a.   Medications containing PPA had serious side effects such as strokes, heart attack and death;

b.   There had been insufficient studies regarding the safety and efficacy of the medications;

c.   The medications containing PPA, and PPA itself, were fully and adequately tested;

d.   Prior studies, research, reports and/or testing had been conducted linking the use of PPA medications to serious adverse reactions, including, but not limited to, stroke, heart attack and death;

32

e.    There was a greatly increased risk of stroke and hypertension as reported in the medical literature.

93.    The misrepresentations of and/or active concealment alleged above were perpetuated directly and/or indirectly by the Defendant.  Defendant knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiffs would rely on them, leading to the use of PPA by them.  Defendant knew that the Alka Seltzer Plus Cold products were sold without a prescription, and without the direct aid and advice of a physician, and that Plaintiffs would be relying on information, advertisements and statements made by Defendant about the use, safety and efficacy of these PPA products.

94.    At the time of Defendant's fraudulent misrepresentations, Plaintiffs were unaware of the falsity of the statements being made and believed them to be true.  Plaintiffs further had no knowledge of the information concealed and/or suppressed by Defendant.

95.    Plaintiffs justifiably relied on and/or were induced by the misrepresentations made by Defendant and relied on the Defendant to provide information about the risks and serious dangers of the PPA products.

96.    Defendant had a post-sale duty to warn Plaintiffs and the public about the potential risks and complications associated with medications containing PPA in a timely manner.

97.    The misrepresentations and active fraudulent concealment by the Defendant

33

constitutes a continuing tort against Plaintiffs and other persons who ingested these PPA medications.

98.    Plaintiffs did not know and could not have known that their injuries were caused by ingestion and use of Defendant's medicines until such time as they were recalled in November 2000, and the general media aired the information.

89.    As a direct producing and proximate result of the actions and conduct of these Defendant as set forth above, Plaintiffs, each of them individually, have sustained injuries and are entitled to the following damages:

a.    Reasonable and necessary health care expenses incurred in the past;

b.    Reasonable and necessary health care expenses which, in all reasonable probability, will be incurred in the future;

c.    Physical pain and suffering in the past;

d.    Physical pain and suffering which, in all reasonable probability, will be endured in the future;

e.    Mental anguish suffered in the past;

f.    Mental anguish which, in all reasonable probability, will be suffered in the future;

g.    Physical disability/impairment, past and future;

h.    Lost wages in the past and future loss of wage earning capacity; and

i.    All other incidental and consequential damages, fees and expenses.

For each of the above, Plaintiffs, individually, seek compensatory damages in an amount in excess of the minimum jurisdictional limits of the Court, for which amount Plaintiffs now sue.

WHEREFORE, THE ABOVE PREMISES CONSIDERED, Plaintiffs demand judgment of the Defendant, Bayer Corporation, for compensatory and punitive damages in an amount determined by the jury to be necessary and just.

TYRONE C. MEANS (MEA003)
LEILA H. WATSON    (WAT052)
**Attorneys For Plaintiffs**

**OF COUNSEL:**

**THOMAS, MEANS, GILLIS & SEAY, P.C.**
**3121 Zelda Court**
**P.O. Drawer 5058**
**Montgomery, Alabama 36106-5058**
**(334) 270-1033**
**(334) 260-9396 Fax**

**CORY, WATSON, CROWDER & DEGARIS, P.C.**
**2131 Magnolia Avenue**
**Birmingham, Alabama 35205**
**(205) 328-2200**

**PLAINTIFFS DEMAND A TRIAL OF ALL ISSUES BY STRUCK JURY**

OF COUNSEL

35

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Complaint, the ____1st____ Day of November, 2001, by mailing the complaint to the following defendant via certified mail:

DEFENDANT TO BE SERVED:

Bayer Corporation
100 Bayer Road
Pittsburgh, PA  15205-9741

This the _____1st____ day of _____November_____, 2001

_____
OF COUNSEL